IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

KELL & LYNCH, P.C.,
        **Plaintiff,**

v.

        Case No. C2-05-346
        Judge EDMUND A. SARGUS, JR.
        Magistrate Judge King

THEODORE PAPPAS,
        **Defendant.**

## OPINION AND ORDER

This matter is before the Court on the Plaintiff's Motion for Summary Judgment (Doc. #20). For the reasons that follow, the Plaintiff's Motion is granted in part and denied in part.

### I.

Plaintiff, Kell & Lynch P.C. ["Kell & Lynch"], brings this action against Defendant Theodore Pappas ["Pappas"] seeking to enforce payment in the amount of $102,614.49 plus attorneys' fees and all other interest, costs, and expenses in accordance with Pappas' signed guaranty. Kell & Lynch has moved for summary judgment pursuant to Fed. R. Civ. P. 56(c). Kell & Lynch is a Michigan corporation with its principal place of business in Birmingham, Michigan. Pappas is a resident of the State of Ohio. This Court has jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1332.

Kell & Lynch is a law firm and Theodore Pappas is a former client of the firm. Prior to the filing of this case, Theodore Pappas was a defendant in a separate lawsuit brought against him and others by De Boer Structures (U.S.A.), Inc., UK and De Boer Structures BV

International [collectively referred to as "De Boer"]. Because the history of that lawsuit has relevancy to the issues at hand, some description of the prior proceedings is necessary.

On May 26, 2000, De Boer filed a complaint against Shaffer Tent & Awning Company and 21st Century Productions ["Shaffer Tent"]. In its initial complaint, De Boer did not name Pappas as a party to the action. Thereafter, on September 22, 2000, De Boer amended the complaint and added Pappas as a defendant. Pappas had started Shaffer Tent, and was its primary stockholder before its attempted sale, which gave rise to the De Boer lawsuit. In turn, Kell & Lynch became defense counsel for Pappas as well as for Shaffer Tent. Shortly thereafter, De Boer moved for a preliminary injunction and the imposition of a constructive trust on Shaffer Tent. On December 11, 2001, this Court granted in part and denied in part De Boer's motion. This Court appointed Pappas as receiver of Shaffer Tent and charged him with maintaining the status quo throughout the litigation.

Kell & Lynch sent monthly billing invoices to the offices of Shaffer Tent. Each invoice contained summaries of the legal work performed alongside the initials of the attorney who performed it, the number of hours worked and the corresponding charge for each service. At the end of each invoice is a section entitled "Timekeeper Summary," consisting of four separate columns, in which the individual attorneys working on the De Boer case listed their names, total hours billed, hourly rates and the total amount of fees owed. All lawyers from Kell & Lynch who worked on the De Boer litigation billed Shaffer Tent by the hour, but the matter at hand concerns only the hourly rates of attorneys Michael V. Kell and Geoffrey T. Pavlic.

When Kell began work on the De Boer case, he charged $175 per hour for his legal services. Pavlic charged $150 per hour. Every invoice sent from July 2000 to June 2001 listed

Kell's hourly rate as $175 and Pavlic's as $150. Kell & Lynch sent these invoices to "Kelly M. Hayes" in Southfield, Michigan. [Def's Mem. In Opp., Exh. 1.]

Beginning in July 2001, Kell & Lynch increased Geoffrey Pavlic's hourly rate to $185 and began sending invoices to the attention of Ted Pappas at "Schafer [sic] Tent and Awning" in Coshocton, Ohio. [Def's Mem. In Opp., Exh. 1.]

On August 1, 2001, Kell & Lynch continued to send its monthly invoice to Shaffer Tent, noting, "Attn: Ted Pappas." The August invoice indicated that Kell's hourly rate had increased to $250. Neither Pappas nor Shaffer Tent objected to the increases nor took issue with Kell & Lynch concerning those increases and continued to pay each invoice. With its last payment, made on October 22, 2002, Shaffer Tent paid in full its invoices through March 2002. [Kell Aff., Feb. 10, 2006, at ¶ 6].

During October of 2002, while the De Boer litigation was in high gear, Shaffer Tent fell into financial difficulty and found itself unable to muster the financial resources to pay Kell & Lynch's invoices in full. Kell & Lynch exchanged several communications with Shaffer Tent, through which it became evident that Shaffer Tent did not have the funds to pay the invoices. [Compl., Exh. F.]

On April 23, 2002, Kell and Pavlic filed a Motion to Withdraw as Counsel for Defendants Shaffer Tent, observing that while they were aware that the trial was scheduled for June 10, 2002, the defendants' discovery material and briefs were detailed and extensive enough to sufficiently acquaint any new counsel selected by Shaffer Tent with the issues. [Pl's Mot. For Summ. Jdgmt., Exh. B, at ¶¶ 4-6].

On May 6, 2002, Pappas, through his personal attorney, filed a Memorandum in

Opposition to Michael Kell and Geoffrey Pavlic's Motion to Withdraw. The Memorandum in Opposition stated that even though Pappas was dismayed by the prospect of losing Kell & Lynch "since there would be months of preparation required to familiarize new counsel," he was ready to move for continuance of the trial date in order that he might have time to seek and prepare new counsel. [Compl., Exh. C.] On May 7, 2002, this Court held a hearing on the Motion to Withdraw.

On June 10, 2002, in order to ensure Kell & Lynch's representation in the upcoming trial—and on advice from Paul Scherbel, an attorney from Coshocton, Ohio—Pappas personally signed a Guaranty, which action made him guarantor for Shaffer Tent in the event that Shaffer Tent would default on the attorneys' fees owed to Kell & Lynch. Pappas, having a substantial interest in Shaffer Tent, also had a significant interest in the pending litigation. The Guaranty states, in pertinent part:

### GUARANTY

THIS GUARANTY is executed as of this 10th day of June, 2002.

1. GUARANTY. In consideration of and in order to induce KELL & LYNCH P.C., a Michigan private corporation ("Obligee"), to extend credit and other financial accommodations to SHAFFER TENT & AWNING COMPANY and 21st Century Productions, Inc. ("Obligors"), THEODORE PAPPAS ("Guarantor"), guarantees the punctual payment and prompt and complete performance of when due of all indebtedness, liabilities and obligations of Obligors to Obligee and/or any of Obligee's Affiliates (collectively referred to as "Obligee") presently existing or hereinafter arising from or related to the cause of action instituted by De Boer Structures (U.S.A.), Inc., De Boer Structures (U.K.) Limited, And De Boer International B.V., Case No. Case No. [sic] C2-00-615, including but not limited to litigation, settlement and/or potential sale and/or transfer of all or part of Obligors' assets and/or stock (the "Indebtedness"). Guarantor hereby agree[s] to pay reasonable attorneys' fees and all other reasonable costs and expenses which may be incurred by Obligee in the enforcement or collection of this Guaranty which shall be deemed to be part of the Indebtedness guaranteed by the Guarantor.

2. WAIVER BY GUARANTOR.

    a. To the extent permitted by law, Guarantor waives all notices of any kind and nature,

pursuant to this Guaranty or otherwise, and Guarantor agrees that Obligee's failure to give such notice shall not in any way discharge or diminish the liability of Guarantor. To the extent permitted by law, Guarantor hereby expressly waives notice of, any right to consent to and any defense based upon, and agrees to be bound notwithstanding each and every one of the following:

    (i)    acceptance of this Guaranty by Obligee;

    (ii)    presentment, protest and demand and notice of protest and demand, or any of them, with respect to the Indebtedness;

[...]

    (iv)    nonpayment or other default under this Guaranty;

[...]

    (x)    any other circumstances which might cause a discharge or reduction of liability of Obligors, other than the full, final and unavoidable payment of the Indebtedness.

[...]

3.    <u>NATURE, SCOPE, AND DURATION OF GUARANTY</u>.

    a.    This Guaranty is unlimited in amount and shall continue from this date until the Indebtedness is paid to Obligee in full in immediately available unrecoverable funds.

[...]

    b.    Guarantor guarantees that all payments on the Indebtedness made by Obligors or any other Guarantor to Obligee, will be final, when made. Guarantor agrees that if any such payment is recovered from or repaid by Obligee, in whole or in part, for any reason, this Guaranty shall continue to be fully applicable to the Indebtedness to the same extent as though the payment so recovered or repaid had never been originally made on the Indebtedness.

    c.    This Guaranty is a guaranty of payment and not of collection. Guarantor's liability is direct, primary and unconditional, and may be enforced by Obligee without first resorting to any other right, remedy or security, including, without limitation, any right or remedy against Obligors or any other person or entity who is or becomes liable in any manner, with respect to the Indebtedness or any property constituting security for any of the Indebtedness.

[...]

7.    <u>APPLICABLE LAW</u>. This Guaranty and its interpretation and application shall in all respects be governed by the law of the State of Michigan. The Guarantor agrees that any legal action or proceeding against it with respect to any of its obligations under this Guaranty may be brought in any state or federal court located in the State of Michigan, as the Obligee in its sole discretion may elect. By the execution and delivery of this Guaranty, the Guarantor submit[s] to and accept[s], with regard to any such action or proceeding, for itself and in respect of its property, generally and unconditionally, the jurisdiction of those courts. The Guarantor waives any claim that the State of Michigan is not a convenient forum or the proper venue for any such suit, action

or proceeding.

[...]

[Compl., Exh. E.]

After signing the Guaranty, Pappas filed a Supplemental Memorandum in Opposition to Michael Kell and Geoffrey Pavlic's Motion to Withdraw on August 13, 2002, in order to give notice to the Court of the June Guaranty. The Supplemental Memorandum states, in part:

> On or about the 10th of June, 2002, Pappas and Kell & Lynch, including Kell and Pavlic, entered into an accommodation whereby they would continue representing Shaffer until completion of the litigation, at least through the trial date. There was consideration for such accommodation and Pappas wishes to make this a matter of record. [Compl., Exh. D.]

On October 3, 2002, this Court held an evidentiary hearing on Kell and Pavlic's Motion to Withdraw. Kell stated that he wished to withdraw from the case so that he would no longer contribute to Shaffer's insolvency and that he would not be required to commit any more time to a "modestly complex matter" in taking the case to trial. [Compl., Hearing, Oct. 3, 2002, Tr. at 5.]

On direct examination, Pappas testified that he felt Kell & Lynch was legally bound to represent him because he had signed the Guaranty and had, in accordance with the Guaranty, made monthly payments to the firm. Pappas gave two reasons for executing the Guaranty: First, because he had believed the trial date to be for July 2002 and did not wish to find new representation for Shaffer Tent; and second, because he had "a lot of faith in Mr. Kell and his firm." [Compl., Hearing, Oct. 3, 2002, Tr. at 10.]

In this matter, Pappas' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment states that he did not become aware of the change in his attorneys' hourly rates until

2003. At the hearing of October 3, 2002, however, Kell stated, in Pappas' presence, that his hourly rate was $250 and that the hourly rate of Geoffrey Pavlic was $200. [Compl., Hearing, Oct. 3, 2002, Tr. at 18.] The Court then asked Pappas whether he would be able to make any payments to Kell & Lynch before the trial, and Pappas replied that he might be able to make a payment of $15,000. [Compl., Hearing, Oct. 3, 2002, Tr. at 20.]

On October 24, 2002, Shaffer Tent filed a voluntary petition for bankruptcy under Chapter 11 of the Bankruptcy Code. After the dissolution of Shaffer Tent's bankruptcy estate, Kell & Lynch received two payments from Bank One: one for $5,146.30 and the second for $15,750.34. The firm accepted these checks and deducted their total from the amount Pappas owed for Plaintiff's legal services. [Kell Aff., Jan. 10, 2006, ¶ 25]. Pappas has not paid the remaining balance of $102,614.49 to Kell & Lynch.

On April 7, 2005, Kell & Lynch filed a Complaint in this Court, seeking judgment against the Defendant, Theodore Pappas, in the amount of $102,614.49. Pappas filed his Answer on June 14, 2005, claiming four defenses: First, that the Complaint fails to state a claim upon which relief can be granted; second, that the Complaint is barred by waiver and estoppel; third, that the Guaranty, which is the subject of this action, was obtained while the Defendant was under duress; and fourth, that the fees due to the Plaintiff are unreasonable "in light of the fact that the plaintiff had neglected to adequately prepare to proceed to trial on the appointed date." [Answer, ¶¶ 24–27.]

On January 10, 2006, Kell & Lynch filed a Motion for Summary Judgment, asserting to wit: First, that Defendant is in breach of Michigan contract law and must pay contractual damages; second, that Defendant cannot establish duress because the Plaintiff did not illegally

compel or coerce the Defendant into signing the Guaranty; third, that the language pertaining to reasonableness applies only to those fees incurred during enforcement of or collection upon the Guaranty and that the attorneys' fees were reasonable because the Court had approved them and the Defendant had not objected to them; and finally, that both Michigan law and federal bankruptcy law preclude Pappas from arguing that Kell & Lynch waived its right to enforce the Guaranty because it accepted payment from Shaffer Tent's bankruptcy estate. Pursuant to the contractual agreement between the parties, the law of Michigan applies.

## II.

The procedure for considering whether summary judgment is appropriate, is found in Fed. R. Civ. P. 56(c);this section provides:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.

The evidence must be viewed in the light most favorable to the nonmoving party. *Adickes v. Kress & Co.*, 398 U.S. 144, 158-59 (1970). Summary judgment will not lie if the dispute about a material fact is genuine; "that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). Summary judgment is appropriate however, if the opposing party fails to make a showing sufficient to establish the existence of an element essential to that party's case and on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); see also, *Matsushita Electronic Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

The United States Court of Appeals for the Sixth Circuit has recognized that *Liberty*

*Lobby*, *Celotex*, and *Matsushita* have effected "a decided change in summary judgment practice," ushering in a "new era" in summary judgments. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476 (6th Cir. 1989). The court in *Street* identifies a number of important principles in the new era of summary judgment practice. For example, complex cases and those involving state of mind issues are not necessarily inappropriate for summary judgment. *Id.* at 1479.

In addition, in responding to a summary judgment motion, the nonmoving party "cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must 'present affirmative evidence in order to defeat a properly supported motion for summary judgment.'" *Id.* (quoting *Liberty Lobby*, 477 U.S. at 257). The nonmoving party must adduce more than a scintilla of evidence in order to overcome the summary judgment motion. *Id.* It is not sufficient for the nonmoving party to merely "'show that there is some metaphysical doubt as to the material facts.'" *Id.* (quoting *Matsushita*, 475 U.S. at 586). Moreover, "[t]he trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact." *Id.* That is, the nonmoving party has an affirmative duty to direct the Court's attention to those specific portions of the record upon which it relies in order to create a genuine issue of material fact.

### III.

#### A. Duress

In order to obtain summary judgment on its claim for breach of the Guaranty, the plaintiff Kell & Lynch, must show that no genuine issue of material fact exists with respect to the elements of a claim for breach of contract. In Michigan, to prove a breach of contract, the claimant must show: (1) a contract existed between the parties; (2) the terms of the contract

9

required performance of certain actions; (3) at least one of the parties breached the contract; and (4) that the breach of contract caused injury to the non-breaching party. *Webster v. Edward D. Jones*, 197 F.3d 815, 819 (6th Cir. 1999).

Pappas contends there is a genuine issue of material fact with respect to the existence of a guaranty. He argues that a valid contract never existed because he signed the guaranty in a state of duress, which Kell & Lynch caused by filing its Motion to Withdraw so close to the De Boer trial date. Pappas states that without Kell & Lynch's representation he faced financial ruin and had no choice but to sign the Guaranty.

The principles of contractual law apply to contracts of guaranty. *First Nat'l Bank of Ypsilanti v. Redford Chevorlet Co.*, 258 N.W. 221, 223 (Mich. 1935) ("Contracts of guaranty are to be construed like other contracts, and the intent of the parties, as collected from the whole instrument and the subject-matter to which it applies, is to govern.") (quoting *Morris & Co. v. Lucker*, 123 N.W. 21, 22 (Mich. 1909)).

The merits of Pappas' claim of duress rest on proving two elements. Under the law of Michigan, the elements of economic duress are:

> 1. The party alleging economic duress must show that he has been the victim of a wrongful or unlawful act or threat, and
>
> 2. Such act or threat must be one which deprives the victim of his unfettered will.
>
> As a direct result of these elements, the party threatened must be compelled to make a disproportionate exchange of values or to give up something for nothing. If the payment or exchange is made with the hope of obtaining a gain, there is not duress; it must be made solely for the purpose of protecting the victim's business or property interests. Finally, the party threatened must have no adequate legal remedy.

10

*Barnett v. International Tennis Corp.*, 263 N.W.2d 908, 913 (Mich. Ct. App. 1978) (citing 13 Williston on Contracts, § 1617, p. 704).

Put another way, the party claiming duress bears the burden of establishing that he or she was illegally compelled or coerced to act by fear of serious injury to his or her person, reputation or fortune. *Farm Credit Services v. Weldon*, 591 N.W.2d. 438, 447 (Mich. Ct. App. 1998), *cert. denied*, 529 U.S. 1021 (2000).

Here, Pappas has not shown there is a genuine issue of material fact with respect to whether he was the victim of an unlawful act. Kell & Lynch filed its Motion to Withdraw in a federal court, over a month before the trial date. Having not been paid, this action by the Plaintiff cannot be construed as unlawful or wrong. Secondly, Pappas has not demonstrated that the Motion to Withdraw deprived him of his unfettered will. In the Defendant's Memorandum in Opposition to the Motion to Withdraw, Pappas stated that, should the Court grant the Motion to Withdraw, he would move for continuance of the trial date in order to find and prepare new counsel. [Compl., Exh. C.] After Kell & Lynch drafted the Guaranty, Pappas had time to and did consult an attorney with respect to whether or not to sign the Guaranty.

Viewing the evidence in a light most favorable to Pappas as the non-moving party, the Court concludes that no reasonable jury could find that Pappas was subject to economic duress when he signed the Guaranty. Based on the evidence, the Court finds that Kell & Lynch is entitled to summary judgment as to the validity of the Guaranty.

**B. Pappas' consent to the increases in Kell and Pavlic's hourly rates**

Pappas contends that there is a genuine issue of material fact concerning the amount of attorneys' fees owed to Kell & Lynch under the Guaranty. Pappas alleges that he never

consented to the increases Kell and Pavlic made to their hourly rates after July 2001.

Pappas fails to present any evidence to support his argument. The conduct of both parties demonstrates that an agreement existed between them as to the hourly rates. "A contract is implied in fact where the intention as to it is not manifested by direct or explicit words between the parties, but is to be gathered by implication or proper deduction from the conduct of the parties, language used or things done by them, or other pertinent circumstances attending the transaction." *Erickson v. Goodell Oil Co.*, 180 N.W.2d 798, 800 (Mich. 1970).

Pappas' own exhibits, attached to his Response in Opposition to Plaintiff's Motion for Summary Judgment show that Pavlic listed his new billing rate at the end of the July 2001 invoice. When Kell raised his rate in August, the new fee was likewise listed at the end of the August 2001 invoice. These invoices were sent directly to Pappas' attention. Shaffer Tent continued to pay Kell & Lynch's invoices for almost a year. Even after Shaffer Tent found itself unable to continue paying the invoices, it did not take issue with the new hourly rates. When Pappas signed the Guaranty, the contractual language indemnified Pappas for the punctual payment of all Shaffer Tent's indebtedness *"presently existing* or hereinafter arising" from the cause of action instituted by De Boer Structures. [Compl., Exh. E. at ¶ 1.] (emphasis supplied). Yet Pappas still did not object to the increases.

Pappas was present at the October 3, 2002 hearing during which Kell stated before the Court that his hourly rate was $250 and that Pavlic's rate had increased to $200. Yet Pappas did not object to the rates, nor did he or his counsel in any way intimate that the amount owed to Kell & Lynch was disputed. Nor did Pappas dispute the Court's statement that as of October 3, 2002, Shaffer Tent had an outstanding debt of approximately $122,000. [Comp., Exh. F.]

At all times during the De Boer litigation, Pappas' behavior demonstrated that there was an agreement with Kell and Pavlic and that no dispute had arisen as to hourly rates. The only statement to the contrary is found in Pappas' Memorandum in Opposition to Plaintiff's Motion for Summary Judgment. There, Pappas claims that the De Boer litigation coupled with his position of chief operating officer of Shaffer Tent placed so many time constraints upon him that he was unable to discover the invoice statements sent directly to his attention.

On its own, Pappas' statement is insufficient to raise a genuine issue of material fact. *Street*, 886 F.2d at 1479 (non-moving party must present affirmative evidence). Based on the undisputed evidence, the Court finds that Kell & Lynch is entitled to summary judgment with respect to Pappas' consent to the increased hourly rates.

## C. Reasonableness of Fees

Pappas contends summary judgment is precluded where there is a genuine issue of material fact concerning whether or not the attorney's fees and expenses, which Kell & Lynch billed from August 2000 to June 2001, are reasonable. Pappas, however, has already paid the majority of the billings that he now contests without objection, and pursuant to the Guaranty all payments are final. [Compl., Exh. E at ¶ 3b.] Thus, the Court considers only the reasonableness of the remaining $102,614.49 sought by Kell & Lynch in compensation for its legal services.

Kell & Lynch, as Plaintiff asserting breach of contract, bears the burden of proving its damages with reasonable certainty. *In the Matter of Howarth*, 310 N.W.2d 255, 257 (Mich. Ct. App. 1981). Because the claim is for attorneys' fees, Kell & Lynch must show that the fees it billed to Pappas were reasonable. Concerning the requirement of reasonableness, the Michigan Court of Appeals has held, "[a] contract provision such as that at issue here must be construed as

limited to reasonable attorney fees, otherwise it violates public policy as a penalty." *Id.* (citations omitted.)

Upon review of the record available, the Court concludes that the fact-intensive issue of reasonableness of the fees may not be disposed of on summary judgment. Accordingly, the Court, if necessary, will conduct an evidentiary hearing at which each party may present testimony on this issue. The Court denies Plaintiff's Motion for Summary Judgment with respect to the reasonableness of attorneys' fees.

### D. Waiver and Estoppel

Pappas opposes the Motion for Summary Judgment on the basis of a waiver and estoppel claim. Pappas alleges that Kell & Lynch waived its contractual right to collect payment from Pappas as Shaffer Tent's guarantor by accepting two checks from the Shaffer Tent's dissolved bankruptcy estate.

Established law does not support such a claim. The United State Bankruptcy Code explicitly states, "a discharge of a debt of the debtor does not affect the liability of any other entity on, or the property of any other entity for such debt." 11 U.S.C. § 524(e). The common law of Michigan follows this statute. As the Michigan Court of Appeals wrote, "[t]he discharge of a debtor in bankruptcy does not discharge the obligations of guarantors." *Michigan Nat'l Bank v. Laskowski*, 580 N.W.2d 8, 9 (Mich. Ct. App. 1998) (citations omitted.)

Applying this law to the facts, this Court finds here that Pappas signed a written Guaranty, agreeing to personally pay Shaffer Tent's indebtedness to Kell & Lynch should Shaffer Tent fail to remit the payments. This made him the guarantor for Shaffer Tent. Accordingly, Pappas cannot now make a valid claim that the bankruptcy proceedings for which Shaffer Tent

14

was the debtor discharged the debts of Shaffer Tent's guarantors.

The Court finds that there is no genuine issue of material fact to support a claim that Kell & Lynch waived their rights under the guarantee to collect payment from Pappas by accepting money from Shaffer Tent's bankruptcy estate. The Court finds that Kell & Lynch is entitled to summary judgment on the issue of waiver and estoppel.

### IV.

In light of the foregoing, the Plaintiff's Motion for Summary Judgment (**Doc. #20**) is **GRANTED in part and DENIED in part** to the extent set forth above. This matter is scheduled for **HEARING** on the reasonableness of Plaintiff's attorneys' fees on August 7, 2006 at 10:00 A.M.

**IT IS SO ORDERED.**

7-17-2006
DATE

EDMUND A. SARGUS, JR.
UNITED STATES DISTRICT JUDGE